FILED
SUPERIOR COURT
OF GUAM

'14 OCT 31 PM 3: 49

CLERK OF COURT

BY: ___ Q ___

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| ANTONIO ARTERO SABLAN, | DOMESTIC CASE NO. DM0277-11 |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** (Bench Trial) |
| PATRIA UNTALAN SABLAN, | |
| Defendant. | |

## INTRODUCTION

This matter came before the Honorable Maria T. Cenzon for a Bench Trial on August 2, 14, 16, and 19, and September 5, 9, 11, 16, 26, and 27, 2013.[1] Attorney David J. Lujan appeared on behalf of Plaintiff Antonio Artero Sablan ("Plaintiff"). Attorney William B. Pole appeared on behalf of Defendant Patria Untalan Sablan ("Defendant"). Upon review of the pleadings, oral and written arguments and legal authorities presented by the parties, as well as testimony and evidence received during the trial of this matter, the Court now issues its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

By a preponderance of the evidence, the Court makes the following findings of fact:

1.  **Undisputed Facts**.

    Plaintiff and Defendant were married in Reno, Nevada on March 30, 1984, and

---

[1] Upon request of the parties, their Proposed Findings of Fact and Conclusions of Law were submitted for the Court's consideration on November 29, 2013.

separated in March, 2009, although, during the course of the marriage, the parties often physically separated from each other, only to reunite within one year. Shortly after their marriage in 1984, on August 12, 1985, Defendant filed a Complaint for Divorce from the Plaintiff citing extreme cruelty and wrongful infliction of grievous mental suffering. (Pl.'s Exhibit 22, Complaint for Divorce, Domestic Case No. DM907-85 (Aug. 12, 1985)). Plaintiff filed his Answer and Counterclaim on June 11, 1986, alleging extreme cruelty and wrongful infliction of grievous mental suffering. (Plaintiff's Exhibit 23, Answer and Counterclaim, Domestic Case No. DM907-85 (June 11, 1986)). Despite settlement discussions, the parties reconciled and the parties did not continue to prosecute their claims arising out of the 1985 Complaint.

Nearly twenty-five years later, on April 7, 2011, Plaintiff filed his Verified Complaint for Divorce, seeking dissolution on the grounds of irreconcilable differences. On April 21, 2011, Defendant filed her Verified Answer and Counterclaim for Divorce denying irreconcilable differences and alleging abandonment, gross misconduct and infidelity of the Plaintiff. (Def.'s Answer at ¶¶ a – e (Apr. 21, 2011)). She also seeks dissolution of the marriage on the following grounds: extreme mental cruelty, desertion, and adultery "giving rise to the dissolution of the marriage."[2] Defendant seeks spousal support/alimony in the amount of Five Thousand Dollars ($5,000.00) per month from Plaintiff. Plaintiff answered to the Counterclaim on May 16, 2011, asserting the defenses of laches, estoppel, recrimination and condonation. (Pl's. Reply to Counterclaim at p. 2 (May 16, 2011)).

---

[2] *Counterclaim* at ¶ 5, p. 3 (April 21, 2011). Defendant counterclaimed that the Plaintiff repeatedly threatened her with physical harm during the course of the marriage. Guam law provides under 19 GCA § 8209 that "departure or absence of one party from the dwelling place, caused by cruelty or by threats of bodily harm from which danger would be reasonably apprehended from the other is not desertion by the absent party, but it is desertion by the other party."

There are no minor children of the marriage, as the parties' son, Paul Sablan, was born in 1985 in Guam and has reached the age of majority; therefore, there are no issues regarding child support or custody. The residency requirements of 19 GCA § 8318(a) are met, and it is undisputed that both parties were residents of Guam for at least 90 days immediately preceding the filing of the Complaint.

2.    **The Parties' Living Arrangements during the Course of their Marriage.**

A few days after the parties' married in March, 1984, in Reno, Nevada, Plaintiff returned to Guam and Defendant remained in the states for four months until July 1984, to complete her studies. (Bench Trial, September 19, 2013 at 11:21:00). Sometime in January 1985, the parties had a disagreement and Defendant left the marital home for a night to stay with her mother and then returned to live with Defendant. (Id. at 11:28:00). This was to be the first of many periods of separation during the course of the marriage of the parties. Later that January, Defendant left Guam to visit her daughter from a previous marriage, while she was five to six months' pregnant with the parties' son, and returned to Guam after a couple of weeks. (*Id.* at 11:23:00). The parties resided together until they separated again on July 17, 1985. (*Id.* at 11:29:35).

During the marriage, the parties continued to have numerous cycles of separation and reunion. Defendant testified that she lost track of how many periods of separation they endured "because it happened so often," but confirmed that, until the filing of this action, the longest period of time that they had been separated was for eleven (11) months until Plaintiff flew to California to ask Defendant to return to Guam with their son "to become a family again." (Bench Trial, Aug. 19, 2014 at 11:38:46 to 11:40:20). Other typical periods of separation lasted approximately two months. (*Id.* at 11:41:22-34). Over the 24 years of the marriage, the

parties "attempted" to divorce three times before the Plaintiff filed the instant Complaint. The first three attempts were initiated by Defendant, who never prosecuted the first one beyond the filing of the Verified Complaint and never actually refiled again. (*Id.* at 11:30:46 to 11:32:17).

**3.      The Parties' Sexual Relationship During the Marriage and Accusation of Adultery.**

The parties engaged in little sexual relations during their nearly twenty-five (25) year marriage. Defendant could not dispute Plaintiff's estimation that the parties had sex over the course of their over 24-year marriage between 60 to 75 times in total; however, the Court finds it compelling that Defendant would not immediately challenge a notion that the husband and wife engaged in intimate marital relations an average of 2 to 3 times a year. Plaintiff testified that although he was prescribed medication to treat his erectile dysfunction, he saw no point in taking it if he would be continue to be refused sex by his wife. Defendant admitted that Plaintiff was typically the person who initiated sex and she rarely initiated it on her own, but confirmed that she did initiate it three times in nearly twenty-five years of marriage. (Bench Trial, Sep. 26, 2013 at 4:53:46 – 4:55:00). She did not believe that having sex with Plaintiff was a "wifely duty," but stated that she only had sex if she felt affection. She further admitted that she simply felt "no affection" for her husband. (*Id.* at 4:04:50 – 4:06:27). The Defendant also admitted that she decided that she would withdraw from the marriage and change her behavior toward him, deciding she would "stand still like an idiot here and see what happens" (Bench Trial, September 26, 2013 at 4:43:40 4:45:49), indicating that she willfully withheld affection and sexual relations from Plaintiff during the marriage. She testified that she surmised her actions caused the Plaintiff to feel sorry for himself and led him to eventually start a relationship with another woman. Plaintiff admitted to beginning a sexual relationship in 2010 with another woman named Karen, after the parties separated in 2009. By then, Defendant had

withheld sexual relations from Plaintiff since 2003, despite numerous attempts by the Plaintiff to be sexually intimate with her. (Bench Trial, August 16, 2013 at 10:25:28 to 10:26:56).

4.  **Parties Behavior Towards Each Other Contributed to the Dissolution of the Marriage.**

The Court finds that both Plaintiff and Defendant were inconsiderate of the other's needs and desires throughout the marriage. Over the course of the ten-day trial which lasted over a month, it never became clear to the Court why the couple remained married to each other over numerous demands and pleas for attention, affection, and consideration and, in almost equal measure, threats of divorce and dissolution.

The Plaintiff suffered health issues as a result of his diabetes; however, the Defendant was unsympathetic to his condition, at one time, admitting that she wished he would not recover. When he later underwent surgery off-island, the Defendant refused to attend to him, instead travelling to attend a conference in St. Louis, MO. At that time, Plaintiff admits, his friend Karen took care of him and visited him. He testified that it was much later that Karen became his girlfriend.

The Plaintiff was inconsiderate of Defendant's needs. Defendant described instances where the Plaintiff said or did something to her which hurt her or devastated her, including tearing up a photo of her and her daughter during an argument. In 2004, the couple argued because Defendant wanted to see her father in the hospital before visiting with friends for dinner; instead, Plaintiff dropped her off on the roadside and Defendant had to call a relative to take her to the hospital to visit with her father.

During the 1990s the couple went to counseling many times and at one time, a psychiatrist recommended that they divorce because they were "two different personalities," but

the couple continued to remain in the marriage. Defendant also sought counseling on her own. One counselor advised the couple that they were incompatible and recommended that they divorce. However, Plaintiff was adamant that they would *not* get a divorce. (Bench Trial, Sept. 16 at 4:47:30 to 4:49:13). Although Defendant had requested, threatened and also commenced divorce proceedings, she never followed through. In 2009, in what became the final separation of the parties, Defendant willingly moved out of the marital residence and into a unit at the Pahong Court apartments in Chalan Pago ("Pahong Court"), which is held only in Plaintiff's name. At no time since the separation in 2009 have the parties attempted to reunite.

## 5.   Financial Assets and Automobiles

### A.   Retirement Accounts of Plaintiff and Defendant.

Plaintiff receives a monthly retirement income of approximately $3,000 from the Government of Guam Employees Retirement Fund (GGERF). Plaintiff retired from the Government of Guam with 26.5 years of credit – 19 years credit for his years of employment, plus additional credit from a college internship program and service in the United States Navy. He also purchased five years of Early Retirement Incentive Program (ERIP) Service Credit, executing a Promissory Note in favor of the GGERF on January 10, 2000 for $33,007.79 at 8% interest for 15 years. The final installment payment will be deducted from Plaintiff's retirement pay on the pay period ending December 13, 2014. Sixteen (16) years of the marriage overlap with the Plaintiff's government service. (Pl.'s Ex. 20).

Defendant is currently employed with the Government of Guam as a school librarian and has been so employed since September 1993. Defendant has both a 401 retirement plan and a 457 deferred compensation plan. As of March 31, 2009, the 401 plan had a total payroll contribution of $42,105.46 and a total account balance of $43,157.13. (Pl.'s Exhibit 37). As of

March 31, 2009, the 457 plan had a total payroll contribution of $29,190.40 and a total account balance of $27,292.27. (Pl.'s Ex. 36). Defendant admits that these plans are community property.

During the marriage, Defendant also contributed to 403-B supplemental retirement plans with AsiaPacific, having Capital Appreciation Fund A and Fund B accounts. As of April 1, 2009, the total value of the plan was $6,662.57. Defendant later withdrew these funds to pay her attorney in this matter. She admits that this plan is community property.

**B.      Joint Checking with Patrick J.F. Sablan**

The parties share a joint savings account with their adult son at the Bank of Guam. The balance of the account as of December 31, 2009, was $502.60. (Pl.'s Exhibit 42). The Court finds that Plaintiff and Defendant are each entitled to share in one-third of the checking account as their respective sole and separate property.

**C.      Automobiles**

The parties own a 2005 Toyota RAV4, License No. SNJ272, which was purchased new for almost $20,000 and which has been in Defendant's possession since the parties separated in 2009. Plaintiff made the bulk of the payments on the 2005 Toyota RAV4, with the exception of three payments of $462.04 by the Defendant. There is no outstanding loan obligation for the vehicle.

Plaintiff is in possession of a 1999 Toyota Pre-Runner Tacoma Pickup, License No. H695, which he purchased from Defendant's sister. This vehicle remains in his possession and there is no outstanding obligation for this vehicle.

In 2009, after the parties separated, Plaintiff purchased a 2005 Toyota RAV4, License No. ASA6737, which remains in his possession. He has been paying this obligation.

## 6. Real Property: His, Hers & Theirs.

### a. Lot Nos. 10080, 10081-1 10081-2 and all other lots adjoining said Urunao-Machananao, Dededo Guam (now known as Lot Nos. 7 and 8, Tract 34000)

Defendant has an interest in Lot No. 10080 in Urunao (now known as Lot Nos. 7 and 8, Tract 34000) and Lot No. 10081-2 in Ritidian, Guam, having inherited these properties prior to the marriage of the parties. On November 28, 1986, Defendant quitclaimed to Plaintiff any interest she might have in these properties. (Def./Counterclaim Pl.'s Exhibit A).[3]

From June 1995 to October 1997, Plaintiff leased out his Urunao property to Yong Nam Kim (dba Jungle Beach Adventure) for $10,000 per month. On June 1, 2002, Plaintiff entered into a lease agreement with Urunao Resort Development, Inc., to lease his Urunao property for an amount equal to or greater than $10,000 per month. Plaintiff has used proceeds from the Urunao rental property to purchase other properties.

### b. Lot No. 2306-3-R7, Mangilao

Lot 2306-3-R7, Mangilao, Guam, was gifted to Plaintiff in 1986 from his sister Carmen Bisconde. Plaintiff's Exhibit 9. He then sold the property in 1988 for $150,000 and a portion of the proceeds was used to purchase Lot 7079-3 in Yigo in 1989, along with additional consideration, discussed *infra* at subsection c. Defendant does not dispute that this was Plaintiff's sole and separate property. On November 28, 1986, Defendant executed a Quitclaim Deed in which she quitclaimed any interest in this property that she might have to the Plaintiff. (Def./Counterclaim Pl.'s Exhibit A).

---

[3] On November 28, 1986, Defendant voluntarily signed a Quitclaim Deed in which she quitclaimed to Plaintiff any interest she had or may have in (1) Lot 2306-3-R7, Mangilao; (2) Lot 7, Block 6, Tract 232, Sinajana ("Pahong Court"); (3) Lots 10080, 10081-1, 10081-, and all other lots adjoining said Urunao-Machananao, Dededo (aka "The Artero Urunao Beach Property"); and (4) all other rights or claims to any properties, such as the Guam Land Claims, that Antonio acquired after March 30, 1984. This Quit Claim Deed is hereinafter referred to as the "Pahong Court" Quitclaim.

### c. Tract No. 927 (formerly Lot No. 7079-3), Yigo

In April 1989, Plaintiff purchased Lot No. 7079-3, Yigo, in exchange for payment of $85,000 cash from the sale of Lot No. 2306-3-R7, Mangilao in 1988 and his house in Portland, Oregon, both of which were his sole and separate property, having purchased the Portland home prior to the marriage, in August 1979.[4] This property consisted of 34,363.00 square meters. Interest in this property was transferred to Plaintiff through a Warranty Deed dated April 4, 1989 from Rose Aguon Torres aka Rose T. Taijito. (Def./Counterclaim Pl.'s Exhibit LLL). In August 1989, Plaintiff subdivided the basic lot Lot No. 7079-3 into 17 lots, of which 15 lots were deeded to Plaintiff. (Def./Counterclaim Pl.'s Exhibit MMM (Agricultural Subdivision survey Map of Tract No. 927, recorded at the Department of Land Management as Instrument No. 422122)). The 15 subdivided properties are now designated as Lots 1 through 17 R/W (which is a Public Access and Utility Easement), Tract 927, Yigo.[5]

#### (1) Lots 1 and 4, Tract 927, Yigo

On June 6, 1994, the parties acquired together, as husband and wife, from Fidel and Maria San Nicolas Lot No. 3242-1-3, Chalan Pago, via Warranty Deed[6] by exchanging Lot Nos. 1 and 4, Tract 927, Yigo, for which Defendant had signed consents on Deeds of Gift re Lot Nos. 1 and 4, Tract 927, Yigo, stating that she has no interest in these properties.[7] On

---

[4] Defendant does not dispute that the Portland, OR home was Plaintiff's sole and separate property prior to the marriage of the parties. See also, Def./Counterclaim Pl.'s Exhibits LLL (Warranty Deed from Rose Aguon Torres to Antonio Artero Sablan) and MMM (Agreement between Rose Aguon Torres aka Rose T. Taijitro and Antonio Pablo Artero Sablan dated April 4, 1989).

[5] The parties do not dispute that Lot Nos. 15 and 16, Tract 927, Yigo, are not part of the marital estate and so these lots are not addressed here.

[6] Def/Counterclaim Pl.'s Exhibit AA. *Warranty Deed* from Fidel C. San Nicolas and Victoria Sablan San Nicolas to Antonio Artero Sablan and Patria Untalan Sablan, Husband and Wife, dated June 6, 1994 and recorded at the Department of Land Management on June 10, 1994, as Instrument Number 510157.

[7] See Def./Counterclaim Pl.'s Exhibit G. *Deed of Gift* from Plaintiff to Grantees of the subject property, with consent to the transfer by Defendant accordingly: "I, PATRIA UNTALAN SABLAN, …hereby acknowledge that

September 2, 1999, Plaintiff transferred Lot Nos. 1 and 4, Tract 927, Yigo, to the San Nicolases through a Deed of Gift, in exchange for Lot No. 3242-1-3, Chalan Pago. Defendant signed an acknowledgement clause in the Deed that Lot Nos. 1 and 4 are Antonio's sole and separate property and that she quitclaims any interest she has to grantees.[8] Defendant seeks Lot 1, Tract 927, Yigo as her sole and separate property as well as liability for "what is left on the mortgage on said property." (Counterclaim at ¶2, p. 15).

### (2)    Lot 2, Tract 927, Yigo

On January 6, 2002, Plaintiff transferred Lot No. 2, Tract 927, Yigo to Jessica Linda Mendiola via Warranty Deed. (Def./Counterclaim Pl.'s Exhibit GG). Defendant executed a consent to the transfer and quitclaimed "all rights that I have or may have to the subject property." (*Id.* at p. 3). Plaintiff had previously constructed a duplex on Lot 2, consideration for which was the transfer of Lot Nos. 7 and 8, Tract 927, Yigo, to the contractor, Del Builders, as discussed *infra.*

### (3)    Lot 3, Tract 927, Yigo

On November 28, 1990, Plaintiff sold and transferred Lot No. 3, Tract 927, Yigo, to Jerry R.S. Salas, Cisca H. Salas, and Carlos J.S. Salas via Warranty Deed. The language of this Warranty Deed identifies Plaintiff as "a single man." Defendant did not acknowledge or execute any consent to this transfer.

---

subject property is the sole and separate property (not our community property) of my husband, ANTONIO PABLO ARTERO SABLAN, Grantor. I acquiesce with the intent of this "Deed of Gift" and I therefore quitclaim to grantees all claims and rights that I may have on subject property (Lot Number 1, Track 927, Yigo, Guam)."

[8] See footnote 7, *supra.* Additionally, Defendant executed a Spousal Consent and Release on January 29, 1000, attendant to a Mortgage on this property with First Hawaiian Bank acknowledging that "she has no claim or interest in the property and joins in the execution of this mortgage solely to quiet Mortgagee's title by conveying his interest, if any she has, including any homestead interest to Mortgagee and she assumes no liability ...for any liability under [the] provisions of the mortgage...." Defendant admits that the liability is Plaintiff's only and that only Plaintiff has paid the amounts due under the mortgage.

**(4) Lot 5, Tract 927, Yigo**

On February 8, 1994, Plaintiff and Defendant, as husband and wife, executed a Warranty Deed dated February 8, 1994, transferring the property to Beverly Ann Davis. (See Def./Counterclaim Pl.'s Exhibit II). Defendant did not acknowledge or execute any consent to the transfer in this document.

**(5) Lot 6, Tract 927, Yigo**

On June 2, 1994, Plaintiff executed a Warranty Deed granting to William Melendez, Jr., and Lien Melendez, husband and wife, his interest in Lot No. 6, Tract 927, Yigo. Defendant did not execute the Warranty Deed either as a grantor or to quitclaim any interest she may have had in the property.

**(6) Lots 7 and 8, Tract 927, Yigo**

On July 20, 1991, Plaintiff entered into an agreement with contractors Del Builders whereby Del Builders would construct a duplex on Lot No. 2, Tract 927, Yigo, in consideration for the transfer of Lot Nos. 7 and 8, Tract 927, Yigo. At the contractor's instruction, Plaintiff transferred Lot No. 7 to Christopher Datu and Gloria S.C. Datu via Warranty Deed dated July 20, 1991, and transferred Lot No. 8, Tract 927, Yigo, to Ernesto O. Dizon and Yolanda N. Dizon via Warranty Deed dated July 20, 1991. Defendant did not execute either Warranty Deed as a grantor or to quitclaim any interest she may have had in the property.

**(7) Lot 9, Tract 927, Yigo**

On June 10, 1990, Plaintiff entered into a Lease Agreement with Louis Falan and Lydia N. Falan, Husband and Wife, for Lot 9, Tract 927, Yigo for a term of five (5) years, ending on June 9, 1995. (Def./Counterclaim Pl.'s Exhibit OO). Defendant did not execute the

Lease Agreement or indicate a waiver of any interest that she may have to the property. Subsequently, on January 6, 1998, Plaintiff and the Falans entered into a Lease with Option to Purchase. On January 19, 1999, the Falans exercised their option to extend the lease until December 31, 2033. (See Def./Counterclaim Pl.'s Exhibits MM and NN).

### (8) Lot 10, Tract 927, Yigo

On July 4, 2005, Plaintiff entered into a Lease with the Option to Purchase Agreement for Lot No. 10, Tract 927, Yigo, with Wallace K. Santos for $550 monthly. Defendant did not execute the Lease Agreement or indicate a waiver of any interest that she may have to the property. This lease also remains in effect. (Def./Counterclaim Pl.'s Exhibit PP). The last certificate of title indicates that Plaintiff is the sole owner of this Lot. (Def./Counterclaim Pl.'s Exhibit QQ).

### (9) Lots 11 and 12, Tract 927, Yigo

On November 28, 1989, Plaintiff transferred Lot Nos. 11 and 12, Tract 927, Yigo to William Melendez Jr. and Lien Melendez via Warranty Deeds dated November 28, 1989. Defendant did not execute the Warranty Deed either as a grantor or to quitclaim any interest she may have had in the property.

### (10) Lot 13, Tract 927, Yigo

On December 6, 1989, Plaintiff transferred Lot No. 13, Tract 927, Yigo to Joaquin V.E. Manibusan, Jr., and Eileen Manibusan via Warranty Deed. Defendant did not execute the Warranty Deed either as a grantor or to quitclaim any interest she may have had in the property.

### (11) Lot 14, Tract 927, Yigo

On July 8, 1991, Plaintiff sold and transferred Lot No. 14, Tract 927, Yigo, to

Elizabeth T. Cabrera via Warranty Deed. The property sold for $55,000, which Plaintiff claims to have reinvested in real estate.

### (12) Lots 15 and 16, Tract 927, Yigo

See footnote 5, *supra.*

### (13) Lot 17 R/W

This lot is a public access and utility easement and, therefore, not divisible between the parties. (Def./Counterclaim Plaintiff's Exhibit MMM, referencing Land Management Map No. 483-FY89).

### d. Lot No. 7, Block 6, Tract 232, Sinajana, ("Pahong Court")

Plaintiff owns Lot No. 7, Block 6, Tract 232, Sinajana, located at 131 Pahong Court ("Pahong Court"), which he purchased on January 16, 1984, before the parties' marriage in March of the same year. He purchased Pahong Court with the proceeds of the sale of his Lot 2306-3-10, Mangilao, Guam. Plaintiff had acquired Lot 2306-3-10, Mangilao, Guam, as his sole and separate property in July 1982, when he exchanged his Datson Pickup truck with Ignacio Farfan for the property. He subsequently sold this Mangilao property for $11,000 and used $3,500 to pay the remaining balance originally owed for the purchase of Pahong Court and another $7,500 to pay for improvements to Pahong Court. Plaintiff holds a Quitclaim Deed to Pahong Court in his name only.

On November 28, 1986, Defendant quitclaimed to Plaintiff any interest she had in Pahong Court. (Defendant/Counterclaim Plaintiff's Exhibit A, Quit Claim Deed dated 11/28/86, filed in the Department of Land Management as Instrument No. 813008).

Defendant has lived at Pahong Court since the 2009 separation. She testified that she paid rent to Plaintiff for a few months after she moved in, sometime in June 2009. With the

exception of rental payments in the amount of $650, Defendant has not paid rent on this property to Plaintiff, which is subject to a mortgage with the Bank of Guam in an amount exceeding $304,000 and which Plaintiff alone has been paying. The evidence produced at trial established that Plaintiff typically charges $850 per month for the rental of these units.

### e.  Lot No. 20, Block 13, Extension, Tract 212, Malojloj

Plaintiff previously owned Lot No. 20, Block 13, Extension, Tract 212, Malojloj, which was transferred to him in his name only via Warranty Deed dated November 6, 1989. He bought the property for $35,000. On March 26, 2002, Plaintiff transferred the property to Luis P. Flores and Sylvia Guerrero Flores via Warranty Deed. Defendant signed the Warranty Deed the same day, stating that Plaintiff owned the property as his sole and separate property (not community property) and she thereby quitclaims any interest she has in the property. Plaintiff received $75,000 consideration for the property and used the proceeds of this sale to buy Lot No. 3242-PART, Chalan Pago. Defendant does not dispute this is Plaintiff's sole and separate property.

### f.  Lot 276 NEW-1, Merizo

On July 3, 1990, Lot 276 NEW-1, Merizo, was transferred to both parties as husband and wife through a Warranty Deed from Fred A. Aguon and Ruth N. Aguon. (Def./Counterclaim Pl.'s Exhibit R). On September 19, 1990, Defendant signed a Quitclaim Deed transferring her interest in the property to Plaintiff. (Def./Counterclaim Pl.'s Exhibit P). Nine years later, on February 17, 1999, Defendant again affirmed that she had no legal interest in the property when she executed a Consent of Mortgagor's Spouse in which she acknowledged that the property is Plaintiff's separate property and she claims no interest in the

property. (Def./Counterclaim Pl.'s Exhibit S).[9] The 1999 Mortgage is for a 30-year term and secures a loan in the principal amount of $156,000. The uncontroverted testimony is that only Plaintiff has paid for the mortgage on this property and he continues to pay the mortgage. In her Counterclaim, Defendant seeks this property as her sole and separate property, with the debt assigned to the Plaintiff. On Cross-Examination at trial, however, Defendant admitted that she did not want this Merizo property.

g.      **Lot No. 4, Block No. 20, Tract No. 232, Sinajana ("Lis Market")**

On April 24, 1992, Plaintiff acquired in his name only Lot No. 4, Block No. 20, Tract No. 232, Sinajana ("Lis Market"), through a Warranty Deed from Joaquin G. Reyes and Linda T. Reyes. (Def./Counterclaim Pl.'s Exhibit AAA). Subsequently, on April 9, 1999, Plaintiff as Mortgagor, executed a Mortgage with Power of Sale in favor of GE Capital Guam, Inc., to secure a debt of $150,000. (Def./Counterclaim Pl.'s Exhbit CCC). Defendant is not obligated under the Mortgage and, in fact, executed a Spousal Consent stating as follows:

> I, PATRIA U. SABLAN, spouse of ANTONIO ARTERO SABLAN, hereby release and waive my community property interest and hereby convey and transfer any interest that I have or may have in said property to ANTONIO ARTERO SABLAN, and confirm that ANTONIO ARTERO SABLAN shall hold title in his/her name alone as his/her sole and separate property.

Plaintiff is the only obligee under the Mortgage and continues to pay the mortgage payments.

h.      **Lot No. 3242-1-3, Chalan Pago and the Smithbridge Lease**

On June 6, 1994, the parties together, as husband and wife, acquired Lot No. 3242-1-3,

---

[9] The Consent of Mortgagor's Spouse provides as follows: "PATRIA UNTALAN SABLAN acknowledges that the interest conveyed in this instrument is the separate property of her husband, and that she has read the foregoing instrument carefully and consents to its execution and performance in all aspects. PATRIA UNTALAN SABLAN herein acknowledges that she has no claim or interest in the property and joins in the execution of this Mortgage solely to quiet Mortgagee's title by conveying her interest, if any she has, including any homestead interest to Mortgagee and she assumes no liability by these presents for any liability under the provisions of the Mortgage."

Chalan Pago, Guam from Fidel and Maria San Nicolas through a Warranty Deed. (Def./Counterclaim Pl.'s Exibhit AA). The property was obtained in exchange for Lot Nos. 1 and 4, Tract 927, Yigo, for which Patria had signed consents on Deeds of Gift re Lot Nos. 1 and 4, Tract 927, Yigo, stating that she has no interest in these properties. (See, discussion *supra*). On September 3, 2009, Plaintiff and Smithbridge Guam Inc. signed a Lease offer for Lot No. 3242-1-3 and Lot No. 3242-Part 2 for a mutual interest in establishing a hard-fill on the property. (Def./Counterclaim Pl.'s Exhibit CC). The parties agreed that Smithbridge would lease approximately 198 square meters of the property to operate a hard-fill facility for a period of five (5) years. The testimony at trial was that the lease would benefit the property by allowing it to be used as its best and highest purpose while generating income. The Lease offer contained a hand-written consent clause for Defendant to execute indicating her assent to the Lease, which was never executed. During trial, the Plaintiff established that when asked to execute her consent to the Lease, Defendant indicated that it was Plaintiff's property and that "I don't want anything to do with it." Defendant's own testimony at trial was that she believed that everyone who needed to sign the document had already done so, indicating she believed to have no legal interest in the property. However, there is no document executed by the Defendant though which she has transferred her legal interest in this property and Plaintiff's testimony is that the property is community property. (Bench Trial 8/2/2013 at 4:41:13).

i.      Lot No. 107-3-R2, Yona

On August 15, 1997, the parties acquired Lot No. 107-3-R2, Yona, via Warranty Deed from Joseph Munoz Baza. Plaintiff paid $5,000 as a down payment and took over mortgage payments of $1,300 monthly. Plantiff testified that he used proceeds from the Urunao rental and from the sale of lots in Tract 927, Yigo. Defendant did not contradict this testimony. On

August 30, 1997, Plaintiff quitclaimed this property to Patria via Quitclaim Deed, but within a year, Defendant executed a Quitclaim Deed transferring her interest in this property to Plaintiff dated August 10, 1998. Plaintiff subsequently transferred this property to Maria T. Davis (aka Maria Teresita Dela Cruz Cabrera Davis) through a Warranty Deed dated December 22, 1998 in exchange for EA No. 450-2 in I-Denni, Saipan.

j.     Lot No. 3, Block 20, Tract 232, Sinajana, located at 152 Chalan Kanton Tutujan, Sinajana, ("the Blue House")

On February 22, 1999, Maria T.C. Sarmiento and Norma S. Okada nka Norma D. Sarmiento (the "Sarmientos") entered into a Sales Agreement with Defendant for the purchase of Lot No. 3, Block 20, Tract 232, Sinajana (hereinafter the "Blue House"). (Def./Counterclaim Pl's. Exhibit B). The purchase price for the property was $130,000.00. Plaintiff testified that he alone paid the required $5,000 down payment to the sellers and $10,000 down payment to Guam Housing Corporation, as required under the Sales Agreement. Plaintiff testified that the down payments were funded by Urunao rental income and the lease income and proceeds from the sale of lots in Tract 927, Yigo. On February 20, 1999, the Sarmientos executed a Warranty Deed in favor of Defendant only. The Warranty Deed was recorded at the Department of Land Management, Government of Guam as Instrument Number 598955 on February 23, 1999. Plaintiff was not named in the Sales Agreement or in the Warranty Deed as a grantee or spouse of the Defendant. All documentary evidence establishes that Defendant held the property in her name alone.

On July 6, 1999, the parties took out a mortgage on the property to secure a loan of $146,250. (Pl.'s Exhibit II (4) Mortgage between Mortgagor Patria U. Sablan and Mortgagee First Hawaiian Bank dated June 30, 1999). The monthly mortgage payment is $1,119.18.

Using his Urunao and Yigo income and proceeds, Plaintiff alone has paid the $15,000 down payment, the mortgage payments, the improvements to, and the maintenance costs of the Blue house. The mortgage balance at the time of separation was approximately $127,000, and only Plaintiff has paid the mortgage since then. The balance of the mortgage as of August 10, 2013, is $111,693.05. Defendant does not contest the amounts owing on the mortgage, nor does she dispute that all payments made relative to the house were paid by Plaintiff, including the purchase price. However, during the trial, Defendant testified that she believes the Blue House is the parties' community property. She further declared that she did not want the real property itself, but wanted only 50% of the net value of this property, along with a couch and recliner chair contained within.

k.      **Lot Nos. 3325-4-R1 & 3325-4-R/W, Chalan Pago**

On September 29, 1994, Plaintiff acquired in his name only Lot Nos. 3325-4-R1 and 3325-4-R/W, Chalan Pago, through a Quitclaim Deed executed jointly by Jessica Linda Iglesias and Patria Untalan Sablan, as co-Administratrix for the Estate of Maria G. Iglesias. Defendant does not claim an interest in this property.

l.      **Other Real Property—Parties Do Not Dispute Plaintiff's sole ownership.**

The ownership of the following real property interests are not in dispute:

(1)      **Lot No. 3242 PART, Chalan Pago – Plaintiff's property**

On June 5, 2002, Plaintiff acquired in his name only, as his sole and separate property, Lot No. 3242 PART, Chalan Pago, via Quitclaim Deed. Plaintiff bought this property for $45,000, using the proceeds of the sale of Lot No. 20, Block 13 Extension, Tract 212, Malojloj.

(2)      **Lease Re. Lot 154-REM-R5, Mongmong/Toto/Maite**

On November 3, 2007, Plaintiff, as lessee, entered into a Lease with Option to Purchase

Agreement for Lot 154-REM-R5, Mongmong/Toto/Maite. Plaintiff is leasing this property from lessor Geri Ann Mendiola for $500 per month and subleases the property to Leonard and Maria Severin for $500 per month via a Lease with Option to Purchase Agreement dated February 4, 2008.

      (3)     **Lease with Option to Purchase Agreement for Lot 154-REM-5, Mongmong/Toto/Maite**

On November 3, 2007, Plaintiff, as lessee, entered into a Lease with Option to Purchase Agreement regarding Lot 154-REM-5, Mongmong/Toto/Maite. Plaintiff is leasing this property from lessor Clarissa Ann Mendiola for $500 per month. In turn, he subleases the property to Eutistio Hartmen for $500 per month.

      (4)     **Saipan Properties:**

      **(a)**     In June 1964, Plaintiff inherited an interest in Lot 007 H44, Chalan Papago, Saipan, from his father, Vicente Tudela Sablan, through his father's probate case.

      **(b)**     On January 2, 1992, Plaintiff acquired in his name only Lot No. 2003-3-2, Oleai, Saipan via Warranty Deed. Plaintiff purchased the property for $40,000, using proceeds of the sale of the Yigo subdivided lots.

      **(c)**     On May 8, 1997, Plaintiff inherited 1/5 interest in Lot No. 507 New and Lot No. 037 H 01, Papago, Saipan, from his father, via Decree of Final Distribution in his father's probate case. In 1977, Plaintiff then bought a 1/5 interest in these Lots from his sister Carmen.

      **(d)**     On January 7, 1990, Plaintiff acquired Lot No. H-136-10, Papago, Saipan, via Warranty Deed, from Cynthia Camacho, in exchange for approximately $27,000.

Plaintiff paid the purchase price using funds received from the Guam Land Claims Act, from which he received approximately $44,000. Plaintiff transferred this property to Florentina Togawa and Dolores San Nicolas via Quitclaim Deed dated July 6, 2007, and pursuant to a Sales Agreement with Exchange of Like-Kind Property Provision dated July 6, 2007, between Antonio, Florentina Togawa, and Dolores San Nicolas. Plaintiff exchanged this property for Tract 22795-3, Saipan.

**(e)** On September 14, 2007, Plaintiff acquired Lot No. 010 J 21, San Vicente, Saipan, via Warranty Deed, to be held as his sole and separate property.

**(f)** On December 22, 1998, Antonio acquired lot EA No. 450-2, I-Denni, Saipan, via Warranty Deed, in exchange for Lot No. 107-3-R2, Yona. Antonio transferred this property back to Maria Cabrera-Parantar (fka Maria Davis) via Warranty Deed dated April 22, 2009. Patria signed a Consent of Spouse in the Deed, where she acknowledged that she has no claim or interest in the Lot and that she consents to the Deed.

There was no evidence presented during trial which showed that any community property had been used for the purchase or maintenance of the Saipan properties.

7.     **Debts of the Parties**

In addition to the above mortgages, the parties had the following debts at the time of separation:

a) First Hawaiian Bank Visa credit card having an account balance of $12,293.49 as of December 24, 2008;

b) Bank of America Visa credit card having an account balance of $20,337.83 as of December 27, 2008, on which Antonio paid $2,750 on February 26, 2009;

c) Navy Federal Credit Union Visa credit card having an account balance of

$26,874.29 as of December 9, 2008;

d) Bank of Hawaii American Express credit card having an account balance of $7,258.17 as of December 11, 2008;

e) CitiBank credit card having an account balance of $28,262.36 as of January 4, 2009;

f) Navy Federal Credit Union auto loan for the 2005 Toyota RAV4 in Patria's possession, having a balance of $7,062.95 as of December 8, 2008, which was paid entirely by Antonio after separation except for three monthly installment payments of $462.04 made by Patria;

g) Visa credit card having an account balance of approximately $130,000 as of March 2009, and on which Antonio has paid approximately $50,000 since March 2009.

## CONCLUSIONS OF LAW

### A. GROUNDS FOR DISSOLUTION OF MARRIAGE

The Plaintiff seeks dissolution on the basis of irreconcilable differences. Defendant avers that Plaintiff treated her with extreme mental cruelty, repeatedly threatened her with physical harm and has committed adultery. This Court has jurisdiction pursuant to 7 G.C.A. § 3105 and 19 G.C.A. §8201 *et seq.* A dissolution of marriage may be granted for irreconcilable differences pursuant to 19 G.C.A. § 8203(g). A dissolution may also be granted for adultery (19 G.C.A. §8203(a), 8204) and extreme cruelty (19 G.C.A. §8203(b), 8205). *Irreconcilable differences* are those grounds which are determined by the Court to be substantial reasons for not continuing the marriage and which make it appear that the marriage should be dissolved. 19 G.C.A. §8219. *Adultery* is the voluntary sexual intercourse of a married person with a person other than the offender's husband or wife. 19 G.C.A. §8204. *Extreme cruelty* is the wrongful infliction of grievous bodily injury, or grievous mental suffering, upon the other by one party to

the marriage. 19 G.C.A. §8205. Based on the findings of fact set forth herein, the Court finds that the marriage cannot be continued and that both Plaintiff and Defendant contributed to the dissolution of the marriage. Indeed, based on the testimony at trial, the marriage was fraught with disagreements, numerous periods of separation and a palpable disdain or apathy on the part of the Defendant for the Plaintiff which belies the duration of the nearly 25-year marriage. There is sufficient evidence to support awarding Plaintiff a divorce on the grounds of irreconcilable differences.

The court, nevertheless, addresses Defendant's contentions regarding extreme cruelty and adultery. As a general rule, a party seeking dissolution on the grounds of cruelty must establish a claim by a preponderance of the evidence. Defendant failed to establish that Plaintiff inflicted extreme mental cruelty upon her, and the claim that Plaintiff repeatedly threatened Defendant with physical harm, are unsupported by the evidence in this case.

On Defendant's allegation of adultery, Plaintiff's testimony at trial confirmed he committed adultery with Karen and the Court finds the admission sufficient to grant dissolution in favor of Defendant on the ground of adultery.

**B.    SPOUSAL SUPPORT**

Guam law permits one spouse to receive alimony or support from the other in order to provide support for himself or herself and his or her children, or to fund the litigation of the divorce action. In this regard, Title 19 GCA § 8402 provides:

> When an action for dissolution of marriage is pending, the court may, in its discretion, require the husband or wife, as the case may be, to pay as alimony any money necessary to enable the wife, or husband, to support herself and her children, or to support himself and his children, or prosecute or defend the action.
> When the husband or wife willfully deserts the wife or husband, or when the husband or wife has any cause of action for dissolution of marriage as

provided in § 8203 of this Title, he or she may, without applying for dissolution of marriage, maintain in the Superior Court an action against her or him for permanent support and maintenance of himself or herself or of himself and children or of herself and children. When the husband willfully fails to provide for the wife, she may, without applying for dissolution of marriage, maintain in the Superior Court an action against him for permanent support and maintenance of herself or of herself and children.

During the pendency of any such action the court may, in its discretion, require the husband or wife, as the case may be, to pay as alimony any money necessary for the prosecution of the action and for support and maintenance, and execution may issue therefor in the discretion of the court. The court, in granting the husband or wife permanent support and maintenance of himself or herself, or of himself and children or herself and children, in any such action, shall make the same disposition of the community property and of the homestead, if any, as would have been made if the marriage had been dissolved by the decree of a court of competent jurisdiction. The final judgment in such action may be enforced by the court by such order or orders as in its discretion it may from time to time deem necessary, and such order or orders may be varied, altered, or revoked at the discretion of the court.

19 GCA § 8402 (2005), cited in *Stahl v. Stahl*, 2013 Guam 26 ¶36.

"Section 8402 is based on former California Civil Code [section] 137, and thus California cases interpreting section 137 are persuasive." *Stahl* ¶ 36 (quoting *Cruz v. Cruz*, 2005 Guam 3, ¶ 9). However, it is noteworthy that spousal support may also be awarded pursuant to 19 GCA § 8405, which provides that when a dissolution of marriage is granted, the court "shall provide for the medical care, support, reasonable education and maintenance of the children of the marriage and children of either spouse adopted by the other as required by Chapter 34 of Title 5 of the Guam Code Annotated and to make such suitable allowance to the other spouse for that person's support, during that person's life or for a shorter period, as the Court may deem just, having regard to the circumstances of the parties respectively; and the Court may, from time to time, modify its order in these respects." The latter provision does not provide for the

consideration of fault by any of the parties.

In determining whether or not to grant alimony, the court should consider the comparative guilt of the parties, the needs of one spouse, and the ability of the other spouse to contribute support. *Millington v. Millington*, 259 Cal.App.2d 896, 916 (Ct. App. 1st 1968)(citing *Mueller v. Mueller*, 44 Cal.2d 527, 530 et seq. (1955) and *Nunes v. Nunes*, 62 Cal.2d 33, 38 (1964)). When considering the totality of the circumstances in this marriage, the rule in *Millington* does not support any award of spousal support. Although Defendant is granted dissolution on the claim of adultery, her withholding of sex and pattern of indifference towards Plaintiff mitigates a finding of comparative fault in her favor. Furthermore, there was virtually no evidence presented at trial of living expenses or income, so the Court cannot address the last two prongs of *Millington* without speculation. Defendant's requested spousal support of $5,000 a month is wholly unsupported by any evidence she requires $5,000 a month, in addition to her current income, in order to sustain her current needs or lifestyle. Nor was any evidence presented showing Plaintiff can afford to pay this amount. Therefore, at this time, the Court will not make an award of spousal support.

## C. DISTRIBUTION OF PROPERTY

Pursuant to Guam's divorce laws, community property in a divorce granted for irreconcilable differences must be divided equally, but if the decree is rendered on the ground of adultery or extreme cruelty, "the community property shall be assigned to respective parties in such proportions as the court, from all the facts in the case, and the condition of the parties, may deem just." 19 GCA § 8411 (2005). The Court finds the behavior of both parties contributed to the demise of their twenty-five year marriage. However, in granting Plaintiff a divorce on the ground of irreconcilable differences and Defendant a divorce on the ground of adultery, the

Court may divide the community property "in such proportions as the court, from all the facts in the case, and the condition of the parties, may deem just" and without a mandatory adherence to equal division.

### 1. The Distribution of Real Property.

As discussed in great detail, *supra,* Plaintiff held numerous interests in real property in his name alone and as his "sole and separate property" prior to the marriage. Property acquired by either spouse before marriage is separate property. 19 G.C.A. § 6101(a)(1). Following the marriage, Plaintiff sold or otherwise transferred his interest in property which was held in his name only to purchase or obtain property, title to which was held in several ways: in his name only, in both his and Defendant's names, in his and Defendant's names with Defendant later quitclaiming her interest in some of these properties and, finally, in Defendant's name only. One particular property, the marital residence which was also called "the Blue House," was held in Defendant's name only. "Property acquired during the marriage by <u>either</u> husband or wife, or both, is presumed to be community property." 19 G.C.A. § 6105(a)(emphasis added). Pursuant to Guam law, therefore, property that was purchased during the marriage is subject to a rebuttable presumption that it is community property, regardless of the title.

Where one spouse asserts the separate character of property obtained during the marriage, that spouse has the burden of overcoming this presumption. *Kloppenburg v. Kloppenburg,* 2014 Guam 5, ¶ 23 ("The spouse asserting the separate character of property acquired during the marriage has the burden of overcoming this presumption [of community property]; *Babauta v. Babauta ("Babauta I"),* 2011 Guam 15 ¶ 30 (quoting <u>See v. See</u>, 415 P.2d 776, 779 (Cal.1966) (en banc)). The presumption of community property can be overcome through the tracing of the property to a separate source. As the Guam Supreme Court noted in

*Kloppenburg*, "If the property, or the source of funds with which it is acquired, can be traced, its separate property character remains unchanged. But if separate and community property or funds are commingled in such a manner that it is impossible to trace the source of the property or funds, the whole will be treated as community property...." *Kloppenburg* at ¶ 23, citing In re Marriage of Mix, In re Marriage of Mix, 536 P.2d 479, 483 (Cal.1975)(en banc)(quoting Patterson v. Patterson, 51 Cal.Rptr. 339, 345 (Ct.App.1966)).

The Pahong Court Quitclaim, which was executed by the Defendant on November 28, 1986, evidences an intent on the part of the Defendant to disavow any interest in the properties covered by the Deed. During trial, she disclaimed any interest in the Urunao/Ritidian properties and Lot 2306-3-R7, Mangilao, yet asserts a claim against the Pahong Court property. The Court finds that such claims are unsupported by the facts or the law governing her interest, if any, in the properties. "A quitclaim deed only transfers whatever interest the grantor had in the described property at the time the conveyance was made." *Taitano v. Lujan*, 2005 Guam 26 ¶ 19 (quoting *In re Marriage of Gioia*, 14 Cal.Rptr.3d 362, 368 (Cal. Ct. App. 2d 2004)). *See also* 21 GCA § 37101 (2005)("Every conveyance of real property acknowledged or proved and certified and recorded as prescribed by law from the time it is filed with the Director of Land Management is constructive notice of the contents thereof to subsequent purchasers and mortgagees."). The Pahong Court Quitclaim by itself is not dispositive evidence of any legal interest that Defendant may have had in the properties covered by the Deed. Indeed, the Court finds that the Defendant had no claim on any of those properties to divest.

During the course of the parties' marriage, Defendant also executed quitclaim deeds or other documents purportedly transferring any interest she may have in certain real property to Plaintiff. Defendant contends that for certain real property obtained during the marriage and for

which she executed a quitclaim deed, that these were obtained (1) without adequate consideration ("a price which is equal in value for an act or a thing for which it is given");[10] or, (2) through a "undue influence" exerted upon her by the Plaintiff which violated a purported fiduciary relationship each shares with the other by virtue of their marital status, and that this "presumption" of undue influence must be rebutted by the spouse who was advantaged by the transaction (the Plaintiff).[11] The Court disagrees with both of these claims.

### a. Mutual consent of husband and wife to contract is sufficient consideration.

Defendant argues that the quitclaim deeds executed by her and, specifically, the Pahong Court Quitclaim, is invalid because of a lack of "reasonable or complete compensation" or "adequate compensation" which she considers to be "a price which is equal in value for an act or a thing for which it is given." Def.'s Proposed Findings of Fact and Conclusions of Law at p. 8. Guam law does not require that fair market value or other monetary compensation be paid to a spouse in order for the agreement to be enforceable. 19 G.C.A. §6111(c) provides that "[t]he mutual consent of the parties is a sufficient consideration for such an agreement." Thus, Defendant's argument that she did not receive monetary compensation must fail unless the Court determines that there was no "mutual consent," i.e. there was a breach of the obligation to act consistent with that of "persons occupying confidential relations with each other." 19 G.C.A. § 6111(a).

//

//

---

[10] Def.'s Proposed Findings of Fact and Conclusions of Law at p. 8.

[11] Id.

**b.    There is no evidence that Plaintiff failed to act inconsistent with his statutory obligation to Defendant regarding the Quitclaim.**

Defendant also argues that Plaintiff exercised "undue influence" over her and, as a consequence, that the Quitclaim Deed should be void for a breach of his fiduciary duty to her. Moreover, she argues that there is a *presumption* of undue influence if the transaction advantages one spouse over the other. Defendant fails to cite to any Guam statute or case law which supports her blanket assertion that "there is no reason to doubt that a married couple has fiduciary duties between each other" or the presumption of undue influence. Def.'s Proposed Findings of Fact and Conclusions of Law at p. 8. Defendant cites only to case law from Texas and California, the latter of which interprets a California statute that has not been adopted in Guam and which is, therefore, inapposite.

In re. Marriage of Haines, 33 Cal.App.4th 277, 39 Cal.Rptr.2d 67 (Cal. Ct. App. 1995), cited to by Defendant in support of her argument that Plaintiff exercised undue influence over her, addressed the *transmutation* of real property from community property to the husband's separate property. California has provisions of law with respect to the transmutation – or interspousal transaction or agreement which works a change in the character of the property. California Family Code Chapter 5, Sections 850 *et seq.* specifically addresses the transmutation of property and provides that "transmutation is subject to the laws governing fraudulent transfers." Cal. Fam. Code § 851(2004). The court in Haines held that specific statutory procedures must be followed for a transmutation to be effective, otherwise there is a presumption of undue influence arising from the advantage enjoyed by the spouse benefitting from the transmutation. These statutory provisions simply do not apply in Guam.

Instead, spouses in Guam may transfer property between each other subject to 19 G.C.A. § 6111(a) which provides that "[e]ither husband or wife may enter into any engagement or transaction with the other, respecting property subject, in transaction between themselves, to the general rules which control the actions of persons occupying confidential relations with each other." 19 G.C.A. §6111.[12] "Confidential and fiduciary relations are, in law, synonymous and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. The very existence of such a relation precludes the party in whom the trust and confidence is reposed from participating in profit or advantage resulting from the dealings of the parties to the relation." In re. Cover's Estate, 204 P. 583 (Ca. 1922)(citations omitted). The provision of law requiring that interspousal transactions are subject to the general rule which control the actions of persons occupying confidential relations to each other have been interpreted by California courts to mean that:

> In every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity and casts upon the party the burden of proving affirmatively its compliance with equitable requisites and of thereby overcoming the presumption. [citations omitted]. Of course, the mere existence of the marriage relation alone will not, in and of itself, suffice to initiate and support the presumption of undue influence where the transaction between husband and wife is prima facie, or, from all of the circumstances thereof, shown to be fair and free from any material advantage to the husband from and over the wife.[13]

---

[12] California Family Code Section 721 appears to contain statutory provisions which are closest to the language of Section 6111; however, even Section 721 reflects a conscious and deliberate purpose of the California legislature to clarify that that Section 721 of the Family Code "provides that the fiduciary relationship between spouses includes all of the same rights and duties in the management of community property as the rights and duties of unmarried business partners managing partnership property, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, and to abrogate the ruling in In re Marriage of Duffy (2001) 91 Cal.App.4th 923, to the extent that it is in conflict with this clarification."

[13] In re. Cover's Estate, 204 P. at 590 (numerous citations omitted). It is noteworthy to mention, however, that this and other cases interpreted a statute which was previously identical to Guam's Section 6111 and which has since been repealed and reenacted as California Family Code Section 721, but which also further clarifies and adds the obligation of good faith and fair dealing.

Indeed, in this case, the Court has found that at the time Defendant executed the Pahong Quitclaim Deed, she had no legal interest in any of the properties which were subject to the Quitclaim Deed. Even if she had an interest that was then conveyed to the Plaintiff, the conveyance did not fail for lack of consideration because a mutual consent to the transfer is sufficient between spouses under Guam law. Finally, the evidence does not support a finding that Plaintiff exerted any undue influence upon the Defendant in order to obtain the Quitclaim Deed or that he enjoyed any advantage over her from the transfer.

Based upon the testimony during the trial and the applicable law as discussed herein, the Court **HEREBY AWARDS THE REAL PROPERTY AS FOLLOWS:**

i. **Lot No. 3, Block 20, Tract 232, Sinajana, located at 152 Chalan Kanton Tutujan, Sinajana, ("the Blue House") is Community Property.**

The Blue House was purchased in 1999, during the marriage of the parties, purportedly pursuant to a Sales Agreement between the Sarmientos and Defendant, and title to the Blue House is in Defendant's name. This is the home which the parties shared during their marriage and, therefore, the Court finds that it was the "marital home" of the Plaintiff and Defendant. Although the home was purchased with Plaintiff's separate property and title was in Defendant's name only, 19 G.C.A. § 6105(a) provides that such property is presumed to be community property unless the property, or the source of funds with which it is acquired, can be traced. 19 G.C.A. §6105(a); *Babauta v. Babauta*, 2011 Guam 15 (*"Babauta I"*); *Kloppenburg* at ¶ 23. Plaintiff asserts that the Blue House is community property; Defendant seeks a determination that the Blue House is her sole and separate property. Defendant has failed to provide sufficient evidence to rebut the presumption that the property is community property.

The Blue House property was obtained for a purchase price of $130,000.00. Although the Sales Agreement was only between the grantors and Defendant, the evidence at trial established that Plaintiff paid the required $5,000 down payment to the sellers and $10,000 down payment to Guam Housing Corporation using funds from the proceeds of his Urunao rental and the lease income and proceeds from the sale of lots in Tract 927, Yigo. Defendant did not present any evidence to the contrary, nor did she dispute Plaintiff's testimony.

On July 6, 1999, the parties together took out a mortgage on the property to secure a loan of $146,250. The monthly mortgage payment is $1,119.18. Using his Urunao and Yigo income and proceeds, Plaintiff alone has paid the $15,000 down payment, the mortgage payments, the improvements to, and the maintenance costs of the Blue house. He is not, however, entitled to any reimbursement or credit for any post-separation mortgage payments when mortgage payments on the Blue house were "payment[s] made on account of a debt for an asset which the paying spouse was using" and reimbursement is inappropriate. *Babauta I*, 2011 Guam 15 ¶ 33.

Because the Blue House is the community property of the parties and is subject to a mortgage in favor of First Hawaiian Bank which is the obligation of both Plaintiff and Defendant, the provisions of 19 G.C.A. §6104(a) shall apply with regard to the satisfaction of the debt.

ii. **Tract 927, Yigo and its derivative lots are Plaintiff's Separate Property**

**Lot Nos. 9 and 10, Tract 927, Yigo,** are the only lots remaining in Plaintiff's possession. These lots and any income derived therefrom are his separate property, as they derived from Lot No. 7079-3, which Plaintiff purchased using the proceeds from the sale of Lot

No. 2306-3-R7, Mangilao, which was Plaintiff's sole and separate property purchased prior to the marriage. Defendant has also disavowed several times any interest that she may have had in the property; however, the Court finds Defendant had no interest in this property to quitclaim. Defendant seeks an award of Lot No. 1; however, for the reasons set forth herein, the Court denies Defendant's claim to Lot 1, Tract 927, Yigo. Moreover, Lot 1 is not in the parties' possession and has not been in the parties' possession since September, 1999.

### iii. Lot No. 3242-1-3, Chalan Pago, Guam is Community Property

Plaintiff traded two of the subdivided lots from Lot 7079-3, Yigo for Lot No. 3242-1-3, Chalan Pago and the presumption of community property when both parties are named on the title document was not challenged at trial. Indeed, Plaintiff agreed that this property was community property and there was no evidence to the contrary. The presumption of community property applies even if payment for this property was derived from Plaintiff's originally separate property because there is no evidence that Defendant legally transferred any ownership that she may have had in the property. Moreover, the Plaintiff's testimony evidences that he believed Defendant to have a legal interest in the property when he requested that Defendant consent to the Smithbridge Lease. Consequently, any income from the Smithbridge Lease and any proceeds from the sale of this property shall be divided equally between the parties.

### iv. Lot No. 276 New-1, Merizo (822 Chalan Canton Tasi, Merizo, Guam is Plaintiff's Separate Property.

Defendant seeks this property as her sole and separate property based upon an assertion that undue influence was exerted upon her to execute the 1990 Quitclaim Deed conveying her interest in this property to the Plaintiff. In support of this assertion, Defendant argues that , but the Court decrees it community property for the same reasons set forth under Lot No. 3242-1-3,

Chalan Pago: the presumption of community property when acquired in the names of both parties during the marriage was not overcome at trial by Defendant's quitclaim on September 19, 1990.

v. **Lot No. 7, Block 6, Tract 232, Sinajana ("Pahong Court") is Plaintiff's Separate Property**

Plaintiff purchased this property in Jan. 1984 which preceded the marriage. The property was improved by $7,500 of Antonio's separate property from the sale of Lot 2306-3-10 in June 1984. Defendant claims the Pahong Court Quit Claim "fails for want of consideration and as the parties got back together after filing for Divorce in 1985;" however, the Court finds that Defendant never held any legal interest in the Pahong Court property to quit claim; therefore, the Court awards this property to Plaintiff as his sole and separate property. Although Defendant has stayed in the Pahong Court property since the parties' separation making minimal rental payments, the Court will not order Defendant reimburse Plaintiff. Defendant did not have possession of the marital residence, which was titled in her sole name. Equity and Defendant's need to live somewhere during the pendency of this action determine that she is not required to reimburse Plaintiff for back rent.

vi. **Lot No. 107-3-R2, Yona is Community Property**

Lot 107-3-R2, Yona was purchased in 1997 with Antonio's separate property, but the property was acquired in both of the Parties' names. Antonio quitclaimed his interest to Patria on August 30, 1997; then, Patria quitclaimed her interest back to Antonio on August 10, 1998. This history creates a presumption, not rebutted at trial, that it was community property. The property was later exchanged for Lot EA No. 450-2, Saipan. While only Plaintiff can hold title to Lot EA No. 450-2, Saipan, Defendant is entitled to half its value as her share of the

community property interest in Lot EA No. 450-2.

**vii.** **The Following Real Property Interests are Decreed Plaintiff's Additional Separate Property**

1) The undefined interest in Lot 007 H44, Saipan which Plaintiff inherited from his father.

2) The 2/5 interest in Lot 507 New, Saipan: Plaintiff inherited 1/5 in 1997 and purchased 1/5 before the marriage in 1977.

3) The 2/5 interest in Lot 037 H01, Saipan: Plaintiff inherited 1/5 in 1997 and purchased 1/5 before the marriage in 1977.

4) Lot 2003-3-2, Saipan was purchased in 1992 and is presumed Antonio's separate property as the purchase was funded by the sale of the subdivided lots in Lot 7079-3, Yigo, which was also his separate property.

5) Tract 22795-3, Saipan was acquired by a trade for Lot H-136-10 in 2007. When the source of funds for this property is also his separate property the Court presumed it remains Plaintiff's separate property

6) Lots 3325-4-R1 and 3325-4-R-W, Chalan Pago were purchased in Antonio's name on September 29, 1994. It is presumptively Antonio's separate property as it was purchased with income from Urunao and the subdivided Yigo lots, which were all his separate property.

7) Lot H-136-10, Saipan was purchased on January 7, 1990 with Antonio's separate funds from his claim under the Guam Land Claims Act, then traded for Tract 22795-3, Saipan in 2007, which is presumed Plaintiff's separate property as purchased by his separate funds from his personal GLCA claim.

8)     Lot 2306-3-10, Mangilao was purchased in July, 1982 (prior to the marriage) and sold in June 1984.   Plaintiff used $7,500 of the proceeds to improve Pahong Court.   No longer in the possession of Plaintiff, this property was his sole and separate property and proceeds from its sale are Plaintiff's separate property.

**2.     Distribution of Personal Property.**

Based upon the testimony during the trial and the applicable law as discussed herein, the Court HEREBY AWARDS THE PERSONAL PROPERTY AS FOLLOWS:

**a.     Furniture and Appliances located at the "Blue House" to Defendant.**

All furniture and appliances located at the "Blue House" as of the parties' separation shall be the sole and separate property of the Defendant, including, but not limited to the Coconut Grater specifically requested by the Defendant Wife during the trial.   All other appliances and furnishings located at the "Blue House" and obtained solely by the Plaintiff after the parties' separation shall be the sole and separate property of the Plaintiff.

**b.     Vehicles shall be the sole and separate property of each party in possession of the vehicle since the parties' separation.**

The vehicles that the parties currently have in their possession and control shall remain their separate property.   Specifically, the 2005 Toyota RAV4, License No. SNJ272, in Defendant's possession shall remain her sole and separate property; and the 1999 Toyota Pre-Runner Tacoma Pickup, License No. H695 and the 2005 Toyota RAV4, License No. ASA6737 in Plaintiff's possession shall be Plaintiff's sole and separate property.

Both parties shall sign any and all documents required to effectuate this property distribution and to make the vehicle or vehicles each of their separate property.

**c.      Bank of Guam stock shares and shares in Iglecias Corporation are Defendant's separate property.**

Defendant testified that she owns 40 shares of Government of Guam Stock as well as stock in Iglesias Corporation which she inherited. The Court finds that these shares of stock are Plaintiff's sole and separate property.

**d.      Parties' Retirement Benefits Are Community Property.**

Neither Party disputes that their respective Government of Guam retirement plans comprise community property. Plaintiff's retirement plan is a defined benefit plan (*see* 4 GCA Article 1 §§ 8101 *et seq.*) from which Plaintiff has received a fixed monthly payment since his retirement on or about January of 2000. Defendant's retirement plan is a defined contribution plan (*see* 4 GCA Article 2 §§ 8201 *et seq.*) consisting of three separate accounts with a sum certain balance at the time the Parties separated.

**i.      Apportionment of Plaintiff's Defined Benefit Retirement Plan**

Although Plaintiff's retirement is expressed as a monthly income stream and not a present cash value, the Court calculates the community property component of a defined benefit retirement plan (or pension) using the "time rule" approved in *Hart v. Hart*, 2008 Guam 11, which "is not unreasonable when the 'amount of the retirement benefits is substantially related to the number of years of service.'" *Id.* ¶ 42 (citing *In re Marriage of Lehman*, 955 P2d 451, 461 (Cal. 1998)).

Under the time rule, the community share of a defined benefit retirement payment is the number of years of the marriage that coincide with accrual of the retirement benefit divided by the total years of employment credited towards the retirement benefit. Plaintiff retired with 21.5 years of credited service and was married to Defendant for 16 of those

years. Plaintiff purchased an additional five years of service credit during the marriage—these additional years are presumptively community property and purchased with a loan paid for through deductions from Defendant's retirement plan. Therefore, the community interest is the 16 years of marriage plus the 5 years purchased by the community, or 21 years. Dividing this by the total property interest of 21.5 years plus the 5 years of purchased service credit (26.5 years), the Court apportions the community's share at **81%**. *See* Section 5.A. *infra.*

Applying this formula, Defendant is entitled to half of the community's share, or **40.5%**, of Plaintiff's net monthly benefit since March 2009. Plaintiff's monthly benefit is currently $2,691.94 but will rise to $3,000 in January 2015. The Court calculates the current arrears as of October 2014 to be $1,090.24 x 67 months, or **$73,046.08**. The monthly obligation of $1090.24 continues until January of 2015 when it increases to $1,215. This obligation is continuing for as long as Plaintiff collects his monthly retirement benefit. Defendant shall also have a 40.5% interest in any cost of living adjustments or other payments issued ancillary to his retirement benefit.

THE COURT HEREBY ORDERS THE GOVERNMENT OF GUAM RETIREMENT FUND TO ISSUE DEFENDANT'S 40.5% SHARE OF PLAINTIFF'S RETIREMENT DIRECTLY TO DEFENDANT, including any other ancillary benefits at the same proportion, upon this Court's issuance of the final decree of divorce. The Court will further issue any necessary qualified domestic relations orders required by 4 GCA § 8101.2(b)(8)(C).

ii.     **Apportionment of Defendant's Defined Contribution Plan**

Defendant began working for the Government of Guam in 1993 and was still working when the Parties separated. All the contributions to her 401, 457, and 403-B retirement plan up to separation are all presumptively community property as she made them during the

marriage and derived from earnings during the marriage. The total value of these plans at separation was $43,157.13 (401 plan) plus $29,190.40 (457 plan) plus $6,662.57 (403-B plan) or $79,010.10. *See* Section 5.A. *infra.*

The Court deems all of Defendant's defined contribution Government of Guam retirement at the time of separation as community property. Therefore, THE COURT HEREBY AWARDS PLAINTIFF HALF THE VALUE OF DEFENDANT'S RETIREMENT PLANS, or **$39,505.05**.

      e.      **Other property not specifically identified are each of the parties' sole and separate property.**

All other personal belongings currently in the parties control and possession shall remain their sole and separate property.

## D.     DISTRIBUTION OF COMMUNITY DEBTS

Plaintiff has paid for nearly all of the debts after the parties' final separation. Defendant admits that all of the debts herein identified are community debts and that, except for three installment payments on the 2005 Toyota RAV4 loan, she did not pay any of these debts, she did not reimburse Plaintiff for his payments and she has not contributed towards paying for these debts. Furthermore, she admits liability for some of the debts; however, the parties failed to clearly identify the proportion in which each party is obligated for these debts, with the exception of the Mortgage on the Blue House with First Hawaiian Bank and the Mortgage on Lot No. 276-NEW-1 Merizo.

The mortgages on the Blue House, which the Court has determined is community property as it is the marital home of the parties, and the mortgage for the Merizo property is a community debt because it was incurred by both parties during the marriage. *Babauta I*, 2011 Guam ¶39; 19 G.C.A. §6102(b)("*Community debt* means a debt contracted or incurred by either

or both spouses during marriage which is not separate debt."). Thus, pursuant to the provisions of 19 G.C.A. §6104(a):

> Community debts shall be satisfied first from all community property and all property in which the spouses own an undivided equal interest as joint tenants or tenants in common, excluding the residence of the spouses. Should such property be insufficient, community debts shall then be satisfied from the residence of the spouses. Should such property be insufficient, only the separate property of the spouse who contracted or incurred the debt shall be liable for its satisfaction. If both spouses contracted or incurred the debt, the separate property of both spouses is jointly and severally liable for its satisfaction.

Other community debts of the parties include the following:

1. The First Hawaiian Bank Visa credit card is community debt of the parties as it was incurred during the marriage;

2. The Bank of America Visa credit card is community debt of the parties as it was incurred during the marriage;

3. The Navy Federal Credit Union Visa credit card is community debt of the parties as it was incurred during the marriage;

4. The Bank of Hawaii American Express credit card is community debt of the parties as it was incurred during the marriage;

5. The CitiBank credit card is community debt of the parties as it was incurred during the marriage;

6. The Navy Federal Credit Union auto loan for the 2005 Toyota RAV4 in Defendant's possession is community debt of the parties as it was incurred during the marriage;

7. The Visa credit card having an account balance of approximately $130,000 as of March 2009, is community debt of the parties as it was incurred during the marriage;

However, the parties failed to clearly identify the proportion in which each party is obligated for the debts and as the Court has granted Plaintiff a divorce on the ground of irreconcilable differences and Defendant a divorce on the ground of adultery, the Court orders Plaintiff solely liable for the debts of the community as listed herein.

**E.    SEPARATE DEBT**

1.    **Plaintiff's Separate Debt.**  The following are Defendant's separate debt:

(a)    The mortgage on Lot No. 7, Block 6, Tract 232, Sinajana, (131 Pahong Court);

(b)    The mortgage on Lot No. 1, Tract 927, Yigo,

(c)    The mortgage on Lot No. 4, Block No. 20, Tract No. 232, Sinajana.

Consequently, Plaintiff remains solely liable for payment of these obligations.

**CONCLUSION**

For the reasons set forth herein, the Court **HEREBY GRANTS PLAINTIFF A DIVORCE ON THE BASIS OF IRRECONCILABLE DIFFERENCES**, and hereby **GRANTS DEFENDANT A DIVORCE ON THE GROUND OF ADULTERY**, but denying Defendant relief as to all her other asserted claims.

The Court further **DECREES NEITHER PARTY IS ENTITLED TO SPOUSAL SUPPORT.**

The Court **HEREBY ORDERS COUNSEL FOR THE PLAINTIFF** to prepare the Interlocutory and Final Decrees of Divorce consistent with the Court's Findings herein and obtain approval as to form from opposing counsel.

**SO ORDERED** this 31st day of October, 2014.

_____
**HONORABLE MARIA T. CENZON**
**Judge, Superior Court of Guam**

SERVICE VIA COURT BOX
I acknowledge that a copy of the original hereto was placed in the court box of:
D. Tujon
W. Poll
Date: 10/31/14  Time: 3:50 p
Deputy Clerk, Superior Court of Guam